IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

LUPE KING,                          )
                                    )
        *Plaintiff,*                )
                                    )
    v.                              )     No. 20 C 1982
                                    )
SECRETARY DENIS R. McDONOUGH[1],    )     Judge Virginia M. Kendall
                                    )
        *Defendant.*                )
                                    )

## MEMORANDUM OPINION AND ORDER

Plaintiff Lupe King brings this suit against Defendant Denis R. McDonough, Secretary of the United States Department of Veteran Affairs, for violation of the Age Discrimination in Employment Act (29 U.S.C. § 621, *et seq*.), the Rehabilitation Act of 1973 (29 U.S.C. § 794(a), *et seq*.), and Title VII of the Civil Rights Act of 1974 (42 U.S.C. §2000e, *et seq*.). Before the Court is Defendant's motion for summary judgment. (Dkt. 129). Plaintiff Lupe King alleges the Department of Veteran Affairs ("VA") discriminated against her based on her disability and retaliated against due to her engaging in statutorily protected activity. King failed to establish a *prima facie* case for discrimination or retaliation. For the following reasons, Defendant's motion [Dkt. 129] is granted.

## BACKGROUND

Lupe King, a fifty-nine-year-old black woman, began her employment as a medical technician at the Captain James A. Lovell Federal Veterans Affairs Health Care Center ("FHCC")

---

[1] Secretary Denis R. McDonough is automatically substituted for former Acting Secretary Dat Tran and former Secretary Robert Wilkie pursuant to (Fed. R. Civ. P. 25(d)).

in July 2014. (Dkt. 138 ¶¶ 1–2). King's assignment placed her in the Blood Donor Processing Unit on Ship 5. (*Id*. ¶ 2). Throughout King's employment, Kyle Ziegler directly supervised her. (*Id*. ¶ 5). Martha Pope was King's second level supervisor, and Deirdre Desmond was her third level supervisor. (*Id*. ¶ 6). King's primary responsibilities as medical technician included drawing and processing blood from donors, including military personnel, military recruits, and VA personnel, as well as cleaning her work area, restocking for the next day, and other administrative tasks. (*Id*. ¶¶ 3–4). Ziegler did not have issues with King's work performance, and King never received a poor performance review. (Dkt. 148 ¶ 5).

King worked with four individuals on the drive team in Ship 5: Joseph Langley, Sarah Marion, Jocelyn Schaffer, and Michelle Tucker. (Dkt. 138 ¶ 9; Dkt. 142 Ex. 2 at 217:18–19). Due to tensions on the drive team, Ziegler was placed on the blood donor floor full time to monitor employee interactions. (Dkt. 138 ¶ 11). Ziegler recorded inappropriate interactions he observed amongst the drive team from January 10, 2015, through March 18, 2016, including some involving King. (*Id*. ¶ 12; Dkt 131 Ex. 4).

In one instance, Shaffer called King a troll. (Dkt. 148 ¶¶ 6, 10; Dkt. 142 Ex. 2 at 123:4–18). On February 24, 2015, Marion closed a van door while King still was in the van. (Dkt. 148 ¶ 8). King claims her co-workers mocked her stutter by pretending to have a stutter in her presence. (*Id*. ¶ 12; Dkt. 140 Ex. 1 at 84:1–8). King claims her co-workers called her disparaging names, such as "angry black woman," and spoke about "angry black women" in her presence. (Dkt. 140 Ex. 1 at 84:9–20). Langley made animal noises around King. (Dkt. 148 ¶ 16). On July 7, 2015, Langley pushed a phlebotomy cart that made contact with King's foot. (*Id*. ¶ 17; Dkt. 142 Ex. 2 at 125:17–129:15).

In one instance, King made a remark to a person of Indian descent that "there were too many Indian chiefs and not enough Indians in the department," which the individual perceived to be a racial comment. (Dkt. 142 Ex. 2 at 47:2–11). King denies the comment was intended as a racist statement. (Dkt. 142 Ex. 1 at 63:15–25). Ziegler sought disciplinary actions against King several times, but human resources ("HR") and regional legal counsel did not support the actions at the time. (Dkt 138 ¶ 15; Dkt. 142 Ex. 2 at 150:1–15).

Between February 24, 2016, and February 28, 2016, Ziegler recommended to Meggan Babcock, a Supervisory Human Resource Specialist, that King be disciplined for six separate instances of alleged inappropriate conduct that took place between April 27, 2015, and February 24, 2016. (Dkt. 148 ¶ 62). Ziegler issued two Letters of Inquiry to King on February 25, 2016, regarding three incidents that took place from February 23, 2016, through February 25, 2016. (*Id*.). Only one of the incidents, which took place on February 23, 2016, was also included in Ziegler's recommendation to Babcock for discipline. (*Id*. ¶ 64). King did not have any disciplinary action on her record prior to these charges. (*Id*. ¶ 62).

On March 8, 2016, Dierdre Desmond, King's third level supervisor, issued a proposed fourteen-day suspension based on five instances of alleged inappropriate conduct:

a. February 23, 2016: "Two coworkers tried to enter a room to which you had recently returned. Before their arrival, you had closed the door, locking it. Once there was a knock, you opened the door forcefully, which made contact with one of your co-workers. Later, you apologized to one of the co-workers informing them that if you had known one of the two was present, you would not have acted in this manner."

b. February 13, 2016: "[Y]ou sent an email in which you state: 'please be advised my medical hearing device has the capabilities to record voices. ... I have my voice as well as Ms. Pope's voice on Friday.' In your email, you also admit: 'before I can submit any recording to anyone I must inform you of this' and 'so even though it may not be able to be used...' Recording employees without the consent of all being recorded is not appropriate."

    c.  July 7, 2015: "[A]fter a disruption in packing up equipment, you yelled at a coworker to: 'mind [her] business,' or words to this effect."

    d.  April 27, 2015: "[W]hile setting up a blood drive, you admit to telling a coworker to: 'stop talking to me; get out of my face.'"

    e.  November 13, 2015: "[Y]ou were scheduled to work from 7 a.m. until 3:30 p.m. You did not report for duty, and your absence was not authorized. You did not call to request leave as required."

(Dkt. 138 ¶ 16; Dkt. 131 Ex. 5). King disputes the characterization of the charges in the proposed suspension but does not deny the events occurred. (Dkt. 138 ¶ 17; Dkt. 142 Ex. 1 at 26:14–30:12). King submitted a written response to the proposed suspension. (Dkt. 138 ¶ 18; Dkt. 131 Ex. 6). Two of the five charges were not sustained, and the suspension was mitigated from fourteen to ten days. (*Id.*). Specifically, the charges regarding King's comments on July 7, 2015, and April 27, 2015, were not sustained. (*Id.*). King served the ten-day suspension from April 23, 2016, through May 2, 2016. (Dkt. 138 ¶ 19).

On September 22, 2015, King was issued a leave exhaustion notice, informing her that she had low or no leave balances. (*Id.* ¶ 21). On the following day, King texted Ziegler she was sick and would be absent from work the next day, September 24, 2015. (*Id.* ¶ 22; Dkt 142 Ex. 2 at 141:21–142:4). On September 25, 2015, King did not report to work and did not contact Ziegler regarding an additional day of absence. (Dkt. 138 ¶ 23; Dkt. 131 Ex. 2 at 142:17–143:3).

In October 2015, King was approved for intermittent Family and Medical Leave Act ("FMLA") leave, which she took separately through June 30, 2016. (Dkt. 138 ¶ 24; Dkt. 142 Ex. 1 at 67:4-7; Dkt. 131 Ex. 7). On March 4, 2016, King experienced a panic attack while at work. (Dkt. 148 ¶ 18). King experienced two subsequent panic attacks, including one that resulted in an overnight hospital stay on May 10, 2016. (*Id.*). King remained out of work from March 2016 through her termination. (Dkt. 138 ¶ 25; Dkt. 142 Ex. 3). On August 2, 2016, King reached out

to Ziegler acknowledging she was "out of Sick Days, FMLA and personnel time" and requesting information regarding short-term disability or administrative leave "based on concern for [her] safety, both physically and mentally, in the work place [sic]." (Dkt. 138 ¶ 26; Dkt. 142 Ex. 4). King previously reported feeling isolated to Ziegler. (Dkt. 148 ¶ 17; Dkt. 142 Ex. 2 at 69:6–70:1).

On August 6, 2016, King requested 960 hours of administrative leave, citing to mental and emotional injury resulting from her workplace and claiming she had been stalked on federal property. (Dkt. 138 ¶ 27; Dkt. 131 Ex. 9; Dkt. 142 Ex. 5; Dkt. 148 ¶ 46). She also wrote in an email on August 11, 2016, to Ashley Brambilla, a human resources assistant, that she was in fear of being shot or killed at work. (Dkt. 148 ¶ 17; Dkt. 140 Ex. 19). The request was denied due to lack of available leave balances and the fact that administrative leave was not authorized. (Dkt. 138 ¶ 28; Dkt. 131 Ex. 9; Dkt. 148 ¶ 46). Ziegler encouraged King to explore what FMLA and Occupation Workman's Compensation Program ("OWCP") options might be available to her and provided her with resources to pursue leave under both programs. (Id.; Dkt. 138 ¶ 29).

On August 24, 2016, King submitted an SF-71 form requesting 960 hours of leave without pay under the OWCP to cover July 1, 2016, through December 31, 2016. (Dkt. 138 ¶ 30; Dkt. 131 Ex. 11). Ziegler approved King's request on August 30, 2016 "per contractual obligation." (Dkt. 138 ¶ 31; Dkt. 131 Ex. 11; Dkt. 148 ¶ 59). The contractual obligation referred to the requirement that leave without pay be approved pending adjudication of an OWCP claim. (Dkt. 142 Ex. 2 at 196:10–18). Ziegler did not include this detail in the approved SF-71 nor discuss the parameters of "per contractual obligation" with King. (Id. at 196:11–197:5). However, on August 16, 2016, prior to King submitting her request, Brambilla emailed King about circumstances where leave without pay is granted, including "[w]hen requested by an employee who has suffered an

incapacitating job-related injury or illness and is waiting adjudication of a claim for employee compensation by the OWCP." (Dkt. 138 ¶ 33; Dkt. 131 Ex. 34).

On September 30, 2016, the Department of Labor rendered a decision denying King's claim for OWCP. (Dkt. 142 Ex. 6). A letter dated October 20, 2016, was mailed to an address for King in Lisle, Illinois with an order to return to duty for her next scheduled workday after receipt of the letter or otherwise contact Ziegler. (*Id.*; Dkt. 138 ¶ 35). King claims she did not live at the address in Lisle, Illinois and therefore did not receive the order to return to duty. (Dkt. 142 Ex. 1 220:13-221:14). In an email on October 19, 2016, Jessie Gonzales told King, "[Y]ou were on [leave without pay] pending the adjudication until 9/30/16." (Dkt. 142 Ex. 3). However, Gonzales did not provide King with any additional details regarding the adjudication or order to return to duty in the email correspondence. (*Id.*). King did not return to work or contact Ziegler per the requirements in the order to return to duty. (Dkt. 138 ¶ 37).

Regardless of the determination by the Department of Labor on September 30, 2016, and the order to return to duty issued October 20, 2016, King did not return to work or contact Ziegler even after December 31, 2016, the expiration of the period in the initial approved request. (*Id.* ¶ 39; Dkt. 142 Ex. 1 at 223:9–14). On February 14, 2017, the Acting Associate Director of Clinical Support at the FHCC issued a proposed removal of King based on absence without leave from October 3, 2016, through February 4, 2017. (Dkt. 138 ¶ 40; Dkt. 142 Ex. 7). King did not respond to the proposed removal or otherwise report for duty. (Dkt. 138 ¶ 41). On March 24, 2017, the Director of the FHCC issued a letter sustaining the charges in the proposed removal and terminating King's employment, effective on the same day. (*Id.* ¶ 42; Dkt. 142 Ex. 8).

### A. King's Requests for Reasonable Accommodation

King made four requests for reasonable accommodation during her employment. King suffered from a bilateral hearing loss, which her supervisors were aware of at the time of her hire. (Dkt. 138 ¶ 53; Dkt. 148 ¶ 4). In her assigned work location, Ship 5, King operated in an open space where noise echoed, making it difficult at times to hear people close to her. (Dkt. 138 ¶ 53). King complained of her co-workers listening to loud music, impacting her ability to hear. (*Id*. ¶ 54; Dkt. 142 Ex. 1 at 162:17–22). On April 16, 2015, King formally requested a hearing device and stethoscope as a reasonable accommodation. (Dkt. 138 ¶ 55; Dkt. 142 Ex. 14). King's request was approved, and she and Ziegler signed the approval on September 4, 2015. (Dkt. 138 ¶ 56; Dkt. 131 Ex. 22).

On June 29, 2015, King formally requested a reasonable accommodation for "[p]ermanent change in work schedule to 0600 to 1430 daily." (Dkt. 138 ¶ 57; Dkt. 131 Ex. 23). King's request was denied and signed by Ziegler on August 12, 2015. (Dkt. 138 ¶ 58; Dkt. 131 Ex. 24). The form included a section stating, "Although we are not providing the accommodation requested, we are offering an accommodation which we believe would be effective." (Dkt. 131 Ex. 24). As an alternative accommodation, the VA proposed "[t]emporary changes in [tour of duty] will be accommodated if a schedule of medical appointments is provided to your supervisor in advance, and only when possible based on the operational needs of the division. If a temporary change in [tour of duty] is not possible, the use of sick leave, annual leave in lieu of sick leave, or [leave without pay] may be requested in accordance with the Master Agreement." (*Id*.). On August 27, 2015, King signed to "certify that [she] accept[ed] the alternative accommodation offered." (*Id*.).

On August 17, 2015, King formally requested a third reasonable accommodation to prevent her from bending, twisting, stooping, or lifting items over 20 pounds due to medical restrictions imposed by her physician related to a mass on her lower spine area. (Dkt. 138 ¶¶ 61–62; Dkt. 142 Ex. 15). King and Ziegler both signed an approved accommodation on November 23, 2015, indicating a lift assist device would be purchased. (Dkt. 138 ¶ 63; Dkt. 131 Ex. 26).

Finally, King submitted a fourth reasonable accommodation formal request on July 6, 2016, "to be transferred to a different Federal facility (not necessarily VA) but any federal facility." (Dkt. 138 ¶ 65; Dkt. 131 Ex. 28). At the time King submitted her fourth request, Laketha Floyd was the local reasonable accommodation coordinator. (Dkt. 138 ¶ 64). King submitted her request a day after emailing Floyd asking to be re-assigned to a different facility. (Dkt. 148 ¶ 24). In the same email, King identified a position with the Social Security Administration that she was interested in. (*Id*.). King subsequently emailed Floyd identifying two other positions of interest. (*Id*. ¶ 25). Floyd told King she needed to participate in the interactive process in an email on July 6, 2016, prior to King's submission of her request. (Dkt. 131 Ex. 31 at 17). Specifically, Floyd wrote, "Per VA policy, the Employee and Supervisor are required to engage in the interactive process by working collaboratively to identify accommodations that will enable them to perform the essential functions of their job, participate in FHCC activities, and/or enjoy the benefits and privileges of FHCC employment." (*Id*.).

In King's request, she alleged a hostile work environment, retaliation, and enduring "daily mental and emotional abuse from my co-workers." (Dkt. 138 ¶ 68; Dkt. 131 Ex. 28). King also alleged weekly and at times daily mental and emotional abuse from her direct supervisor, Ziegler, and her third level supervisor Deirdre Desmond. (Dkt. 138 ¶ 69; Dkt. 131 Ex. 28). She stated fear for her safety and indicated she could no longer work under "daily mental torture and worrying

whether or not I will return home or end up killed at work." (Dkt. 138 ¶ 70; Dkt. 131 Ex. 28). King submitted documentation outlining her medical condition along with her request. (Dkt. 138 ¶ 73; Dkt. 131 Ex. 30). This documentation detailed King's "high level of anxiety" and "panic attacks." (Dkt. 131 Ex. 30). King's doctor wrote, "In regards to Ms. King['s] psychological impairment she can NO LONGER function in her current work environment. It causes her nervousness, anxious, cognitive issues, depression, [and] constant state of fear." (*Id.*; Dkt. 148 ¶ 29).

Floyd claimed the medical documentation was insufficient because it did not contain information about restrictions or limitations. (Dkt. 131 Ex. 27 at 142:1–5). Floyd did not contact the medical provider who submitted the documentation since she only contacted medical providers if she could not read a form due to technical issues. (Dkt. 131 Ex. 27 at 89:23–90:7; Dkt. 148 ¶ 38). Floyd also did not inform King of her belief that the medical documentation was insufficient. (Dkt. 148 ¶ 37). Floyd stated reassignment is an accommodation of last resort. (Dkt. 138 ¶ 66; Dkt. 131 Ex. 27 at 140:22–143:8; 149:17–24; Dkt. 148 ¶ 40).

Due to the seriousness of the allegations in King's request, Floyd immediately escalated the issue to Babcock, her supervisor, along with regional counsel. (Dkt. 138 ¶ 71). Babcock confirmed transfer is an accommodation of last resort and directed Floyd to initiate the interactive process with King to determine if anything else could be done to accommodate her in her current role. (*Id.* ¶ 67). Babcock further stated, "We then, from my perspective, need to send to [regional counsel] for a denial/job search." (Dkt. 142 Ex. 16). Regional counsel conducted a fact-finding investigation regarding King's statements in order to aid in the determination on her request. (Dkt. 138 ¶ 72).

On August 11, 2016, King followed up with Babcock, Floyd, and others regarding the status of her request.  (*Id*. ¶ 77; Dkt. 142 Ex. 17).  On August 26, 2016, Floyd emailed King that regional counsel reached a final determination on the fact-finding investigation and asked to schedule a time to speak after leaving two messages on King's voicemail.  (Dkt. 138 ¶ 79; Dkt. 142 Ex. 17).  Neither Floyd nor Ziegler previously contacted King to discuss an alternative accommodation.  (Dkt. 148 ¶ 41).  King replied to Floyd's email later that day, copying a number of other individuals at the FHCC stating:

> I will not be taking any phone calls from anyone at the FHCC for the following reasons: This issue is now an EEO matter [and] [e]very time I have contact with FHCC management my anxiety level increases causing me headaches, gastrointestinal upset and insomnia. . . . Right now every white person on this string is saying and using the 'N' word; that I'm crazy for sending this.  Truth be told, it's just that I only serve one GOD and they aren't it and I'm just exhausted with the [] FHCC systematic racist tactics.  No verbal communication will be done from this point on, I'm aware of this tactic also.

(Dkt. 142 Ex. 17).  King claims her intention in this email was to communicate only in writing and not over the phone, in part due to a suggestion from her union representative. (Dkt. 142 Ex. 1 at 206:9–207:19; 261:13–262:4).  King also claims she "could have done a Zoom thing or something like that."  (*Id*.).

In consultation with her supervisor and regional counsel, Floyd denied King's reasonable accommodation request for transfer to a new facility.  (Dkt. 138 ¶ 82; Dkt. 131 Ex. 27 at 144:13–18).  On September 9, 2016, Martha Pope signed the denial of King's request.  (Dkt. 138 ¶ 82; Dkt. 131 Ex. 32).  King did not sign the document, and in place of her signature, the form indicates "Employee has not returned to work."  (*Id*.).  In the document, Pope wrote as reasons for the denial, "Reasonable accommodation is an interactive process; therefore the employee must be involved. The employee has stated she will not speak to anyone at FHCC nor will she return to FHCC;

therefore deeming it difficult to accommodate the employee within her current position as reassignment is a last resort." (*Id.*; Dkt. 148 ¶ 53).

On September 20, 2016, King signed a delivery receipt of the Accommodation Request Determination, which was mailed to her address in St. Louis, Missouri. (Dkt. 138 ¶ 83; Dkt. 142 Ex. 18). Following this denial as well as notification of denial of King's occupational claim on September 30, 2016, King did not return to work. (Dkt. 138 ¶ 84).

**B. King's Equal Employment Opportunity Complaints**

On December 16, 2014, King filed her first equal employment opportunity ("EEO") complaint alleging a hostile work environment and discrimination based on disability, which she subsequently withdrew on January 14, 2015. (Dkt. 138 ¶ 43; Dkt. 142 Ex. 9; Dkt. 142 Ex. 10). King filed a second EEO complaint on July 24, 2015, which she amended multiple times through May 11, 2016. (Dkt. 131 Ex. 18; Dkt. 148 ¶ 21). King ultimately asserted twenty-five claims, alleging discrimination, retaliation, and a hostile work environment based on race and disability. (*Id.*; Dkt. 138 ¶ 47).

On June 5, 2017, King filed a third EEO complaint alleging retaliation, discrimination, and hostile work environment based on race and disability, as well as age discrimination and reprisal. (Dkt. 138 ¶ 49; Dkt. 142 Ex. 12; Dkt. 142 Ex. 13; Dkt. 148 ¶ 22). On July 24, 2017, the Office of Resolution Management for the VA ("ORM") issued a letter of partial acceptance of King's claims, accepting one claim for review: "[w]hether complainant was discriminated against based on race (African/Latina), disability, age, and reprisal (prior EEO activity) when on March 24, 2017, she was removed from employment." (Dkt. 138 ¶ 50; Dkt. 142 Ex. 13).

On February 17, 2016, the ORM investigator interviewed Ziegler in connection with King's second EEO complaint to complete a follow-up affidavit. (Dkt. 148 ¶ 60). The investigator

previously interviewed Ziegler in January or February 2016. (Dkt. 140 Ex. 14 ¶ 38). On February 24, 2016, Ziegler signed and submitted a five-page written affidavit associated with the complaint. (Dkt. 148 ¶ 61). The ORM issued a final decision on King's second EEO complaint on May 9, 2018, finding no discrimination based on disability or reprisal for any of King's claims. (Dkt. 138 ¶ 48; Dkt. 131 Ex. 18). On February 26, 2020, the ORM issued a final agency decision on King's third EEO complaint finding King "failed to prove that she was discriminated against as alleged." (Dkt. 138 ¶ 51; Dkt. 131 Ex. 35 at 6).

## STANDARD OF REVIEW

Summary judgment is proper when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56. In determining whether a genuine issue of material fact exists, the Court must view the evidence and draw all reasonable inferences in favor of the party opposing the motion. *See Bennington v. Caterpillar Inc.*, 275 F.3d 654, 658 (7th Cir. 2001); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). However, the Court will "limit its analysis of the facts on summary judgment to evidence that is properly identified and supported in the parties' [Local Rule 56.1] statement." *Bordelon v. Chicago Sch. Reform Bd. of Trustees*, 233 F.3d 524, 529 (7th Cir. 2000).

## DISCUSSION

On December 12, 2017, King filed a *pro se* complaint in the Southern District of Illinois appealing her second and third EEO complaints though a final agency decision had not been entered in either matter at that time. (Dkt. 1). The ORM issued a final agency decision for King's second EEO complaint on May 9, 2018, and a final agency decision for her third EEO complaint on February 26, 2020. (Dkt. 138 ¶¶ 48, 51). On March 26, 2020, this case was transferred to the

Northern District of Illinois. (Dkt. 31). King filed her Third Amended Complaint ("TAC") on July 20, 2021, bringing six claims for relief against Defendant. (Dkt. 124). King alleges age, race, and disability discrimination and retaliation. In King's response to this motion, she withdrew her claims in Count I (Violation of Title VII – Race Discrimination) and Count V (Violation of the Age Discrimination in Employment Act ("ADEA") – Age Discrimination). (Dkt. 137 at 1 fn. 2). The remaining counts at issue are Count II (Violation of Title VII – Retaliation); Count III (Violation of the Rehabilitation Act – Discrimination); Count IV (Violation of the Rehabilitation Act – Retaliation); and Count VI (Violation of the Age Discrimination in Employment Act – Retaliation).

## A. Violation of the Rehabilitation Act – Discrimination (Count III)

### i. Failure to Accommodate Claim

The Rehabilitation Act "prohibits discrimination in the same manner as the Americans with Disabilities Act and uses the same standards but applies to employees of federally funded programs." *See Kraus v. Shinseki*, 846 F. Supp. 2d 936, 947 (N.D. Ill. 2012); *Peters v. City of Mauston*, 311 F.3d 835, 842 (7th Cir. 2002) ("This Court looks to the standards applied under the Americans with Disabilities Act of 1990 (ADA), 42 U.S.C. § 12111 *et seq*., to determine whether a violation of the Rehab[ilitation] Act occurs in the employment context."). Under the ADA, an employer's failure to make reasonable accommodations for a known disability amounts to unlawful discrimination. 42 U.S.C. § b(5)(A). An employer must provide "reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability . . . unless such [employer] can demonstrate that the accommodation would impose an undue hardship on the operation of [its] business." 42 U.S.C. § 12112(b)(5)(A).

To support a claim for failure to accommodate, King must demonstrate: (1) she is a "qualified individual with a disability;" (2) the VA was aware of her disability; and (3) the VA failed to reasonably accommodate her disability. *Gratzl v. Office of Chief Judges of 12th, 18th, 19th, & 22nd Judicial Circuits*, 601 F.3d 674, 678 (7th Cir. 2010). To satisfy the third element, the "ADA requires that employer and employee engage in an interactive process to determine a reasonable accommodation." *Baert v. Euclid Beverage, Ltd.*, 149 F.3d 626, 633 (7th Cir. 1998); *see also Spurling v. C & M Fine Pack, Inc.*, 739 F.3d 1055, 1061 (7th Cir. 2014) ("After an employee has disclosed that she has a disability, the ADA requires an employer to 'engage with the employee in an "interactive process" to determine the appropriate accommodation under the circumstances.'") (quoting *E.E.O.C. v. Sears, Roebuck & Co.*, 417 F.3d 789, 805 (7th Cir. 2005)). If an employer fails to offer an available reasonable accommodation, the third element of a failure to accommodate claim "turns on the 'interactive process' requirement." *Sansone v. Brenna*, 917 F.3d 975, 980 (7th Cir. 2019) (citing *Sears, Roebuck & Co.*, 417 F.3d at 805). In such circumstances, "responsibility will lie with the party that caused the breakdown." *Id.* (quoting *Sears, Roebuck & Co.*, 417 F.3d at 805).

The VA either granted or plausibly denied each of King's four requests for reasonable accommodations. The VA granted King's first request for a special hearing aid and amplified stethoscope to accommodate her bilateral hearing loss. (Dkt. 138 ¶ 56; Dkt. 131 Ex. 22). The VA denied King's second request to permanently change her working hours to accommodate medical appointments without using leave. (Dkt. 138 ¶ 58; Dkt. 131 Ex. 24). Instead, the VA offered temporary changes when King presented her appointment schedule in advance if the operational needs would allow a change. (Dkt. 131 Ex. 24). The VA granted King's third request for a reasonable accommodation due to a medical condition prohibiting her from "bending, twisting,

stopping, or lifting items greater than 20 pounds" by providing her with a lifting device for such items. (Dkt. 138 ¶ 63; Dkt. 131 Ex. 26).

On July 6, 2016, King requested transfer to a different federal facility, not necessarily one in the VA. (Dkt. 138 ¶ 65; Dkt. 131 Ex. 28). She cited as reasoning:

> I have been working in a hostile working environment since August 2014. . . . I endure daily mental and emotional abuse from my co-workers and weekly, sometimes daily mental and emotional abuse from management . . . I have been verbally and physically attacked while at work on federal property. I fear for my safety and I am no longer able to work under daily mental torture and worrying whether or not I will return home or end up killed at work. (Dkt. 131 Ex. 28).

Due to the seriousness of the allegations, Floyd, the local reasonable accommodation coordinator, elevated the issue to regional counsel for a fact-finding investigation. (Dkt. 138 ¶ 71). Once the investigation closed without substantiating King's claims, Floyd attempted to contact King, calling twice and then e-mailing. (*Id*. ¶ 79; Dkt. 142 Ex. 17). A reasonable accommodation may include reassignment to a vacant position. 42 U.S.C. § 12111(9); *see also Tyler v. Ispat Inland, Inc.*, 245 F.3d 969, 973 (7th Cir. 2001) (finding the reassignment of an individual with "medically diagnosed paranoia and delusions of persecution" that "caused him to fear his coworkers" was "entirely reasonable"). King claims Floyd failed to perform her duty of considering a reassignment and seeking out opportunities as well as submitting her resume to opportunities King identified. However, King bears the responsibility for the breakdown in the interactive process in this case, and therefore the VA is not liable under a failure to accommodate claim.

While King asserts her August 26, 2016 email was simply a request for a written response and not a refusal to engage in the interactive process, the substance of the email belies that assertion. In response to Floyd asking "to schedule a time that we can speak to discuss your [reasonable accommodation] request," King wrote:

15

> I sent an email to your boss, Meggan Babcock on Friday indicating that my simple request was past the normal time frame of 30 days. I also indicated that I would be filing a new EEO complaint on the 24th if a decision had not been made by then. I received an email from Meggan Babcock on the evening of the 24th indicating 'my request was still under review with 'management officials.' I filed my formal EEO complaint that evening as well. Therefore, I will not be taking any phone calls from anyone at the FHCC for the following reasons: This issue is now an EEO matter Every time I have contact with FHCC management my anxiety level increases causing me headaches, gastrointestinal upset and insomnia.
> . . .
> [B]ecause you were asked to deliver the decision via phone, I'm positive it isn't favorable, otherwise they would have had you send it via è correspondence as usual.
> . . .
> Right now every white person on this string is saying and using the "N" word; that I'm crazy for sending this. Truth be told, it's just that I only serve one GOD and they aren't it and I'm just exhausted with the [ ] FHCC systematic racist tactics. No verbal communication will be done from this point on, I'm aware of this tactic also.

(Dkt. 142 Ex. 17). From the text of this email, King did not indicate only a preference for correspondence over email. She clearly states that she would not communicate with anyone at the FHCC in part because "[t]his issue is now an EEO matter."

King also claims that she was unaware of any expectation to engage in the interactive process. In fact, Floyd informed King in an email on July 6, 2016, "Per VA policy, the Employee and Supervisor are required to engage in the interactive process by working collaboratively to identify accommodations that will enable them to perform the essential functions of their job, participate in FHCC activities, and/or enjoy the benefits and privileges of FHCC employment." (Dkt. 131 Ex. 31 at 17). In response, King sent the email asking not to be contacted. Choosing to have no additional contact does not amount to "working collaboratively," and the responsibility lies with King for the breakdown of the interactive process.

### ii. Adverse Action Claim

To prevail on a claim for discrimination on the basis of disability, King must establish: (1) she is disabled; (2) she is otherwise qualified to perform the essential functions of the job with or

16

without reasonable accommodation; and (3) the adverse job action was caused by her disability. *Shell v. Burlington N. Santa Fe Railway Co.*, 941 F.3d 331, 335 (7th Cir. 2019). An adverse employment action "generally fall[s] into three categories: (1) termination or reduction in compensation, fringe benefits, or other financial terms of employment; (2) transfers or changes in job duties that cause an employee's skills to atrophy and reduce future career prospects; and (3) unbearable changes in job conditions, such as a hostile work environment or conditions amounting to constructive discharge." *Alexander v. Casino Queen, Inc.*, 739 F.3d 972, 980 (7th Cir. 2014) (quoting *Barton v. Zimmer, Inc.*, 662 F.3d 448, 453–54 (7th Cir. 2011)).

If King successfully establishes a *prima facie* case, "the employer must articulate a legitimate, nondiscriminatory reason for the adverse employment action, at which point the burden shifts back to the plaintiff to submit evidence that the employer's explanation is pretextual." *David v. Bd. of Trustees of Community College District No. 508*, 846 F.3d 216, 225 (7th Cir. 2017) (quoting *Andrews v. CBOCS West, Inc.*, 743 F.3d 230, 234 (7th Cir. 2014)); *see also Nawrot v. CPC Intern.*, 277 F.3d 896, 905 (7th Cir. 2002). "In determining whether an employer's stated reason is pretextual, [t]he question is not whether the employer's stated reason was inaccurate or unfair, but whether the employer honestly believed the reason it has offered to explain the discharge." *Harper v. C.R. England, Inc.*, 687 F.3d 297, 311 (7th Cir. 2012) (internal quotation marks omitted) (citation omitted).

King cannot establish a *prima facie* case of disability discrimination for her termination. King made no response to the proposed removal issued on February 14, 2017, and did not return to work. (Dkt. 138 ¶ 41). On March 24, 2017, the Director of the FHCC issued a letter sustaining the allegations of removal, and King's employment was terminated. (*Id.* ¶ 42; Dkt. 142 Ex. 8). The basis for King's termination was absence without leave for an extended period of time. King

did not show up to work, though she was required to, for four months – October 3, 2016 through February 3, 2017. (Dkt. 138 ¶ 40; Dkt. 142 Ex. 7). Even if the Court takes King at face value that she did not receive the order to return to duty issued in October and believed she was approved for leave through the end of the year, she makes no claim of believing she was permitted to remain out of work in January or February of 2017. Extended absence from employment cannot be said to meet the legitimate expectations of an employer, and King fails to put forward sufficient evidence to support a genuine issue of material fact for the premise that her disability motivated her dismissal.

Even if King could establish a *prima facie* case of discrimination, she cannot establish pretext. Charging absenteeism in a proposed removal letter and ultimately terminating an employee for no response and no return to work are legitimate actions by the VA. There is no evidence in the record to support a notion that these actions were not the genuine or honest reasons for King's dismissal.

## B. Retaliation Claims (Counts II, IV, and VI)

To avoid summary judgment, King may establish a *prima facie* case of retaliation under either the direct or indirect method of proof. *Khowaja v. Sessions*, 893 F.3d 1010, 1014 (7th Cir. 2018). King may offer direct evidence that points explicitly to a discriminatory reason for the action, such as an admission from the employer that "I'm firing you because you had the nerve to accuse me of sex discrimination!" *Coleman v. Donahoe*, 667 F.3d 835, 860 (7th Cir. 2016) (citation omitted). Plaintiff may also proceed under the direct method of proof by presenting circumstantial evidence that "points directly" to an impermissible reason for the materially adverse action. *Atanus v. Perry*, 520 F.3d 662, 671 (7th Cir. 2008). To establish a *prima facie* case for retaliation under the well-established *McDonnell Douglas* indirect or burden-shifting framework,

King must demonstrate that: (1) she engaged in a statutorily protected activity; (2) she performed her job to the VA's legitimate expectations; (3) she suffered an adverse employment action; and (4) the VA treated similarly situated employees that did not engage in statutorily protected activity more favorably. *Atanus*, 520 F.3d at 677.

A materially adverse action must be "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibility, or a decision causing a significant change in benefits." *Lewis v. City of Chicago*, 496 F.3d 645, 652 (7th Cir. 2007). However, for claims of retaliation, "the range of conduct prohibited . . . is broader than Title VII's [anti-]discrimination provision." *Id*. at 654 (internal citation omitted). Unlawful acts of retaliation are not limited to those affecting the terms and conditions of an individual's employment. *Id*. Still, the challenged action "must be one that a reasonable employee would find to be materially adverse such that the employee would be dissuaded from engaging in the protected activity." *Id*. at 655. Adverse actions do not include acts that are no more "than a mere inconvenience or an alteration of job responsibilities." *Atanus*, 520 F.3d at 677–78 (citation omitted).

Of King's twenty-six claims, only two amount to adverse actions: the ten-day suspension in 2016 and her dismissal in 2017. King claims that the suspension in 2016 should survive summary judgment, dedicating only two sentences in her response to the three retaliation claims: "It is well-established that an employer may not retaliate against an employee for engaging in protected activity under Title VII, ADEA, or the Rehabilitation Act. . . . Accordingly, for the reasons set forth above, this Honorable Court should deny the Motion as to [Count II, Count IV, and Count VI], as there exists a genuine issue of material fact that the 10-day unpaid suspension was in retaliation for King's engagement in protected activity." (Dkt. 137)

For the 2016 suspension, King admits she engaged in each of the three sustained claims that resulted in the suspension:

> Specification A: On February 23, 2016, you were on the 3rd floor of Ship 5. Two coworkers tried to enter a room to which you had recently returned. Before their arrival, you had closed the door, locking it. Once there as a knock, you opened the door forcefully, which made contact with one of your coworkers. Later you apologized to one of the coworkers informing them that you if you had known one of the two was present, you would not have acted in this matter.
>
> Specification B: On February 13, 2016, you sent an email in which you state: "please be advised that my medical hearing device has the capabilities to record voices . . . . I have my voice as well as Ms. Pope's voice on Friday." In your email, you also admit: "before I can submit any recording to anyone I must inform you of this" and "so even though it may not be able to be used…" Recording employees without the consent of all being recorded is not appropriate.
> . . .
>
> Specification A: on November 13, 2015, you were scheduled to work from 7 a.m. until 3:30 p.m. You did not report for duty, and your absence was not authorized. You did not call to request leave as required.

(Dkt. 138 ¶ 16; Dkt. 131 Ex. 5). Though she disputes the characterizations of the events, she does not deny the events took place. (Dkt. 138 ¶ 17; Dkt. 142 Ex. 1 at 26:14–30:12). There is no evidence in the record to support a direct causal link between King's race, age, disability, or engagement in a protected activity and the suspension.

King is also unable to establish a *prima facie* case of retaliation under the burden-shifting framework. Though she satisfies the first and third prongs, she fails to provide adequate evidence to support the second or fourth prong. King did not meet the VA's legitimate expectations. King's unapproved absence and inappropriate interactions with coworkers violated VA policies. Even if King were to satisfy the second prong by meeting the VA's legitimate expectations for an employee, she put forward no evidence of a similarly situated comparator treated better than her. "A similarly situated employee is one who is comparable to plaintiff in all material respects." *Perez v. Illinois*, 488 F.3d 773, 773 (7th Cir. 2007) (citation omitted) (internal quotation marks omitted). King makes no effort

to establish a similarly situated comparator or demonstrate how she was treated differently as the basis for her retaliation claims. (Dkt. 137).

If King established a *prima facie* case, the burden would shift to the VA to provide a "legitimate, nondiscriminatory reason" for its actions. *Atanus*, 520 F.3d at 677. After doing so, King would bear the burden to provide evidence to show the articulated reason is pretext for discrimination. *Id*. King has not demonstrated the reasons provided by the VA for the suspension are pretextual. King's primary point of issue is Ziegler having completed an affidavit associated with her second EEO complaint on February 24, 2016, after meeting to finalize the affidavit on February 17, 2016. (Dkt. 148 ¶¶ 60–61). Still, there is not sufficient evidence to find that the VA's reasons for suspending King were dishonest pretext for retaliation on the basis of her engagement in a protected activity. To the contrary, King admits that the events supporting her suspension did in fact take place. (Dkt. 138 ¶ 17; Dkt. 142 Ex. 1 at 26:14–30:12). Regardless, the Court need not decide the issue of pretext since King is unable to establish a *prima facie* case at the outset as her actions did not meet the legitimate expectations of the VA and she's put forward no similarly situated comparators. "Under the indirect method of proof, failure to satisfy any one element of the *prima facie* case is fatal to an employee's retaliation claim." *Hudson v. Chicago Transit Authority*, 375 F.3d 552, 560 (7th Cir. 2004).

## CONCLUSION

For the foregoing reasons, Defendant's motion for summary judgment [129] is granted. Plaintiff Lupe King failed to establish a *prima facie* case for discrimination on the basis of disability or retaliation.

Virginia M. Kendall
United States District Judge

Date: September 29, 2022